**In re Petition for DISCIPLINARY ACTION AGAINST Donald Bedelle FULLER, an Attorney at Law of the State of Minnesota.**

No. CX–99–2061.

Supreme Court of Minnesota.

Jan. 25, 2001.

———

Edward J. Cleary, Director, Patrick R. Burns, Senior Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, for Petitioner.

Donald Bedelle Fuller, Pro Se.

## OPINION

PER CURIAM.

In 1999, the Director of the Office of Lawyers Professional Responsibility requested that the Lawyers Professional Responsibility Board find that probable cause existed for either public discipline or a transfer to disability inactive status for attorney Donald Fuller. A Board panel found probable cause for public discipline, but declined to find probable cause for the transfer to disability inactive status. A petition for disciplinary action was then filed and we referred the matter to a referee for a hearing. The referee recommended that Fuller be suspended indefinitely from the practice of law for a minimum of one year, that he complete a psychological evaluation, and that he follow any recommendations of the evaluation. Fuller challenges the referee's recommendations. We indefinitely suspend Fuller from the practice of law with no minimum term and place conditions on his reinstatement.

Donald Fuller has had a long legal career marked by many achievements. In 1971, Fuller graduated from the University of Illinois Law School and was admitted to the practice of law in Illinois. He entered the Marine Corps in 1972 and served on active duty until June 1976. In 1974, Fuller was certified as a military judge, which certification is still current. From 1976 through 1983, Fuller practiced law in Illinois and remained a reserve officer with the Marines. Fuller then re-entered the Marines on active duty until he was discharged in 1986. He remained in the Marine Reserves until he retired in 1994 as a full colonel. Fuller moved to Minnesota in 1987. He passed the Minnesota bar exam and was admitted to the practice of law in Minnesota in 1990. In addition to his Minnesota attorney license, Fuller is licensed to practice law in the state of Illinois, the Military Court of Appeals, and the United States District Courts for the Districts of Minnesota and Eastern Illinois.

Fuller's prior disciplinary history consists of two admonitions. On April 12, 1993, he was admonished for violating Minn.R.Prof.Conduct 1.9 for filing a suit for a current client against a former client without obtaining the former client's consent. On May 20, 1996, he was admonished for failing to pay bad faith attorney fees arising from a March 1995 district court order. In the memorandum issued with the admonition, the Office of Lawyers Professional Responsibility (OLPR) noted that Fuller had conducted a voluminous and irritating letter-writing campaign, which the OLPR stated illustrated poor judgment, but did not cross the line of proper conduct. Fuller disputes this second admonition, asserting that he had signed a note to pay the fees.

Fuller's current disciplinary problems stem from his representation of Brett Hanson, Hanson's businesses, and Hanson's business associates. Fuller began representing Hanson and his businesses in bankruptcy and tax proceedings in 1990. In September 1995, Fuller prepared a Chapter 11 bankruptcy filing for one of Hanson's businesses, Imprint Technologies, Inc.[1] Fuller maintains that when he agreed to represent Imprint and Hanson

---

1. The bankruptcy was originally filed for a company called Safety Line, Inc. It was later amended to Imprint Technologies, Inc. There were actually a number of Imprint bankruptcy filings, but the September 1995 filing is the one relevant to this petition.

in the 1995 Chapter 11 filing, he conditioned his representation on Hanson receiving chemical dependency treatment.

Hanson paid Fuller weekly cash payments as compensation for his work on the Imprint bankruptcy. Fuller testified that before the establishment of this payment method, he learned that Hanson had paid Imprint's former bankruptcy attorney cash and that the payments were not reported to or approved by the bankruptcy court. Fuller asserts that when he learned of this arrangement, he reported it to the supervising attorney in the U.S. Trustees' Office and the OLPR, but neither of these entities took action or informed Fuller that the arrangement was illegal. The record is silent as to whether the Trustees' Office or the OLPR received such a report. When Hanson's filing check was not honored and Hanson threatened to bring a disciplinary action against Fuller, Fuller asserts that he agreed to accept $290 per week in cash from Hanson and not disclose the payments to the bankruptcy court. Hanson, however, testified that the cash payments were made at Fuller's request.

In February 1996, at Hanson's request, Fuller began representing Pamela Jordan in a Chapter 13 bankruptcy proceeding. Jordan was an employee of Imprint and a "partner" of J.D., Inc., Imprint's predecessor company. The Chapter 13 bankruptcy was filed to protect Jordan from levies against her wages for unpaid withholding taxes due from J.D., Inc. during Jordan's tenure as a "partner" of the corporation.

On May 2, 1996, the bankruptcy court issued an order confirming Imprint's reorganization plan and requiring Imprint to file objections to proofs of claim within 30 days of the order date or of the date the claim was filed. In another order issued the same day, the court ordered Imprint to report within 10 days on payments to be made under the reorganization plan.

At this same time in 1996, Fuller was representing Imprint in an unlawful de-

tainer action. Fuller had been negotiating with Imprint's landlords for a number of months in an attempt to obtain a new lease for Imprint and to pay the debt owed for past rent. Despite these efforts, a district court hearing on the unlawful detainer action was scheduled for Tuesday, June 4, 1996. Fuller asserts that 6 days before this hearing, during a conversation with Imprint's CPA, he learned that Hanson planned to take "up to the $40,000's" out of Imprint, despite the bankruptcy proceedings. Two days later, on May 31, Jordan and another employee asked Fuller about receiving their payments from Imprint's 401(k) plan. Fuller asserts that even though he knew some of Imprint's 401(k) funds were missing, prior to this date he believed that all the money in the 401(k) plan was Hanson's.

On Saturday, June 1, Fuller received a fax from Hanson essentially stating that Imprint's landlords should "shove it." On the next day, Sunday, June 2, Fuller wrote a letter to Hanson about the lease in which, despite the tone of Hanson's fax, he "gave Imprint the benefit of the doubt." In the letter, Fuller blamed the delay in obtaining a new lease on the landlords and their attorney. Fuller testified that he then met with Imprint's CPA and Hanson on Monday, June 3, and learned that the company was moving and Imprint was not going to pay the landlords the money owed as rent. That same day, Fuller also confronted Hanson about the missing 401(k) funds.[2]

On the evening of June 3, after numerous telephone conversations with Hanson, Fuller withdrew from representing Imprint on both the bankruptcy and the unlawful detainer matters. In a letter to Hanson dated June 3, Fuller stated that the reason for the withdrawal was Hanson's refusal to seek chemical dependency treatment. Fuller did not attend the June 4 unlawful detainer hearing, nor did he file a motion to withdraw from the bankruptcy action. Fuller testified that he did not file

---

**2.** Hanson was eventually convicted of im- proper allocation of 401(k) funds.

any of the required objections to proofs of claims in the bankruptcy proceedings, some of which were due on June 3, because Hanson ordered and threatened him not to do anything. Fuller also testified that he did not take certain other actions because he was afraid of Hanson. At Fuller's disciplinary hearing, neither Fuller nor the OLPR attorney questioned Hanson about his involvement in or his reaction to Fuller's withdrawal as his and Imprint's attorney.

On June 4, Hanson attended the unlawful detainer hearing. Hanson did not inform the court or Imprint's landlords about Fuller's withdrawal as the attorney of record, but instead explained Fuller's absence by telling the court that Fuller had been in a car accident. Following the unlawful detainer hearing, Hanson and the landlords signed a new lease agreement and a past-due payment schedule. Imprint did not comply with either the new lease terms or the payment schedule. At his disciplinary hearing, Fuller attempted to use Imprint's noncompliance with the new agreement as evidence of the necessity for his withdrawal. He attempted to do this by offering testimony of the landlords, but the referee did not allow the landlords to answer questions on this topic.

On June 6 and 11, Fuller, by letter, notified the attorney for the committee of unsecured creditors and the attorney for the landlords that he had withdrawn from representing Imprint and Hanson due to Hanson's failure to receive chemical dependency treatment and Hanson's propensity for writing worthless checks. On June 11, Hanson wrote a letter to Fuller, reminding Fuller that Hanson's treatment plans were confidential.

Fuller eventually wrote letters about Hanson to over 25 individuals and government agencies, such as Vice President Al Gore, Attorney General Janet Reno, the FBI, the IRS, Hanson's former attorney, the Minnesota Attorney General's office, the OLPR, judges involved with Imprint litigation, and creditors of Imprint. In these letters, Fuller accused Hanson of chemical dependency, fraud, intimidation, and murder. In a letter to federal and state tax authorities, Fuller alleged that Hanson had underreported the sale price of some Imprint assets, despite the fact that Fuller had drafted the sale documents and knew the actual sale price, which price was subsequently confirmed by the buyer. Fuller asserts that Hanson told him the price was higher than reported in the documents. Fuller sent letters to some of Hanson's creditors disclosing Hanson's prior bankruptcies and his conviction for converting Imprint's 401(k) funds. Fuller also alleged in his letters that Hanson had threatened Fuller and had converted funds to his personal use. Hanson testified that at least one of Imprint's creditors received such a letter and contacted Hanson about it. In September 1999, Fuller filed a complaint with the bankruptcy court, on behalf of Jordan and himself, objecting to the discharge of Hanson's debts in his personal bankruptcy. This complaint was dismissed because it was not timely filed.

Hanson filed a disciplinary complaint against Fuller with the OLPR and on September 5, 1997, Fuller appeared before the Fourth District Ethics Committee of the Hennepin County Bar Association to respond to Hanson's allegations. The Committee found the conduct of both Fuller and Hanson, a nonattorney, to be troubling and recommended a further investigation of Fuller by the Lawyers Professional Responsibility Board (LPRB).[3]

---

**3.** While it is the conduct of Fuller that is the issue before the court, some of Hanson's actions warrant mention. Hanson has been involved in disciplinary proceedings against his previous attorney and threatened to file a disciplinary complaint against the attorney for Imprint's landlord. According to an affi-

davit by Pamela Jordan, Hanson was "quite pleased or rather smug" when he filed ethics charges against Fuller. As recently as May 2000, Hanson was requesting to be listed as an interested party on all bankruptcy proceedings in which Fuller was the attorney of record. Hanson copied Fuller on each of

In December 1997, the OLPR requested copies of all letters Fuller had sent regarding Hanson and Imprint and a list of all persons Fuller had contacted. In a reply letter, Fuller listed many of the persons he had contacted, but stated that he did not keep any letters or files relating to Hanson. In August 1998, the OLPR requested additional information from Fuller about his reasons for withdrawing as counsel from Imprint. In response to this request, Fuller sent the OLPR copies of letters dated September 1996 and July 1997 in which he alleged that Hanson made death threats, committed fraud, and abused alcohol. At Fuller's disciplinary hearing, the addressees of these letters were questioned and neither of them could recall receiving the letters nor could they find the letters in their files.

In February and March 1999, at the suggestion of the OLPR, Fuller agreed to submit to evaluations to be conducted by a psychologist and a psychiatrist. The psychologist who tested Fuller noted in his report that Fuller expressed "pervasive paranoid traits" and that Fuller based his explanations of his conduct on his "ethics, morality, and truth." The psychiatrist reviewed the psychologist's report in addition to Fuller's civilian and military medical records and met with Fuller for four hours. The psychiatrist concluded that Fuller suffered from a Paranoid Personality Disorder. The psychiatrist clarified that this disorder is not one in which the individual is delusional, but instead the disorder can lead to the types of difficulties Fuller has had, such as problems in interacting with clients or interpreting professional regulations. The psychiatrist was not certain that Fuller's disability would warrant placement on disability status, but the psychiatrist did state that Fuller would benefit from professional help.

In May 1999, the Director of the OLPR requested that a panel of the LPRB find probable cause existed for public discipline or a transfer to disability inactive status. On November 4, 1999, the LPRB panel found probable cause for public discipline, but declined to find probable cause for Fuller's transfer to disability inactive status. On December 2, 1999, the OLPR filed a petition for disciplinary action. According to the OLPR, the petition, which contains two counts, was based on the complaint filed by Hanson. Count one relates to Fuller's representation of Imprint and Hanson and alleges improper withdrawal from representation, improper disclosure of client confidences, and failure to disclose the source of Imprint attorney fees in violation of Minn. R. Prof. Conduct 1.16(c), 1.16(d), 1.5(a), 1.6, 3.3(a), 3.4(c), 4.1, 4.4, 8.4(c), and 8.4(d). Count two alleges that Fuller submitted false evidence in a disciplinary investigation in violation of Minn. R. Prof. Conduct 3.3(a)(4), 3.4(b), 8.1(a), and 8.4(c).

On January 10, 2000, we referred the matter to a referee to make findings and conclusions and to recommend a disposition. A hearing on the petition was held before the referee in April 2000. The referee issued his findings, conclusions, and recommendations on May 23, 2000, and recommended that we indefinitely suspend Fuller with a 1 year minimum term, that we require Fuller to successfully complete a mental health evaluation, and that he follow all recommendations of the evaluation. Fuller timely ordered a transcript of the hearing and challenges the findings, conclusions, and recommendations of the referee.

I.

██ Fuller ordered a transcript of the referee's hearing under Rule 14(e) of the Rules on Lawyers Professional Responsibility (RLPR) and therefore the findings

these requests and noted that until Fuller obtained a court order requiring Hanson to cease this activity, he would continue to seek

out all of Fuller's clients and send them copies of the OLPR's petition and recommendations.

and conclusions of the referee are not conclusive. *See* Rule 14(e), RLPR. Nevertheless, we will overturn the findings and conclusions of a referee in a disciplinary proceeding only if they are clearly erroneous. *See In re Reiter*, 567 N.W.2d 699, 701 (Minn.1997). The referee's findings on disputed facts are given great deference. *See In re Wyant*, 533 N.W.2d 397, 400 (Minn.1995). In this appeal, Fuller does not directly dispute most of the factual findings of the referee, but instead argues that his actions were necessary in order for him to fulfill his higher duty to the court and his other clients.

The referee found three separate categories of violations of the Rules of Professional Conduct in Fuller's handling of his representation of Hanson and Imprint: improper withdrawal from representation, misrepresentations and improper disclosure of client confidences, and failure to disclose fees. The referee found as a fourth violation that Fuller provided false information to the OLPR during the disciplinary investigation. We will proceed to discuss each of the four violation categories separately.

*Improper Withdrawal*

■ The referee found that Fuller's withdrawal from representing Imprint on June 3, 1996 violated Rule 9010–3 of the Local Rules of Bankruptcy Court for the District of Minnesota. Rule 9010–3(e) requires that an attorney in Fuller's position make a motion to withdraw or file the proper substitution papers. *See* Minn. R.Bankr.P. 9010–3(e). Until an attorney complies with this requirement, he will remain the attorney of record. *See id.* The referee found that Fuller's withdrawal from representing Imprint also violated Minn. R. Prof. Conduct 1.16(c) & (d). Rule 1.16(c) requires that an attorney follow any local rules for withdrawal employed by a tribunal and Minn. R. Prof. Conduct 1.16(d) requires that an attorney continue to operate in the interests of the client while withdrawing. Fuller does not dispute that he failed to comply with the

bankruptcy court rules for withdrawal as the attorney of record. However, he asserts that he could not continue to represent Hanson and Imprint because doing so would expose him to liability for Hanson's fraudulent activity. Additionally, Fuller testified that after he notified Hanson of his withdrawal, Hanson stated that he had found alternate counsel and ordered Fuller not to do anything else.

Fuller is correct that he was required to withdraw from representing Imprint once he discovered Hanson's fraud. *See* Minn. R. Prof. Conduct 1.16(a)(1). However, despite this duty to withdraw and the pressures applied by Hanson, Fuller is still required to conform to the tribunal's procedural requirements and the Rules of Professional Conduct. Without furthering any fraud by Hanson or Imprint, Fuller could have appeared in court and made a motion to withdraw without a substitution or he could have withdrawn upon the filing of a substitution of attorney signed by the appropriate parties. *See* Minn. R. Bankr.P. 9010–3(e). Therefore, we conclude that the referee did not clearly err when he concluded that Fuller's conduct in withdrawing from the representation of Imprint was improper.

*Misrepresentations and Improper Disclosures*

■ The referee made a number of findings in support of his conclusion that Fuller violated Minn. R. Prof. Conduct 1.6(a) & (d) by revealing confidences and secrets gained during representation of Imprint and Hanson. Fuller first argues that Hanson's chemical dependency and treatment plans were not a client secret because he did not gain the information from his professional relationship with Hanson and that Hanson had given him permission to disclose the treatment plans. Fuller also asserts that referring to Hanson's need for treatment was much less harmful to Hanson than stating that the reason for his withdrawal was due to an extensive number of improper and fraudulent activities. Hanson testified at Fuller's

disciplinary hearing that he did not recall ever discussing his treatment plans with Fuller and that he never authorized Fuller to disclose his plans. The referee concluded that Fuller disclosed Hanson's treatment plans, which were a client secret as defined by Minn. R. Prof. Conduct 1.6(d).

The referee also concluded that Fuller had violated Minn. R. Prof. Conduct 1.6(d) when he disclosed that Hanson had written worthless checks. Fuller alleges that although he represented Hanson in the criminal action relating to his worthless checks, Hanson's conviction for theft by check was a public record, so it cannot be a client secret. The referee agreed with Fuller that disclosure of Hanson's conviction for theft by check did not violate the Rules of Professional Conduct; however, Fuller did not give any justification for his disclosures that Hanson continually wrote Fuller worthless checks, which the referee concluded to be disclosure of a client secret.

Fuller responds to all the charges of improper disclosure of client confidences by asserting that he was required to disclose the information so he would not be assisting Hanson in illegal activity. Minn. R. Prof. Conduct 1.6(b) provides six circumstances in which an attorney may disclose client confidences. The first exception is that an attorney may disclose a client confidence if he has the consent of the client. *See* Minn. R. Prof. Conduct 1.6(b)(1). The other exceptions relevant to this petition are that an attorney may reveal "the intention of a client to commit a crime and information necessary to prevent a crime" and "confidences and secrets necessary to rectify the consequences of a client's criminal or fraudulent act in the furtherance of which the lawyer's services were used." Minn. R. Prof. Conduct 1.6(b)(3) & (4). Fuller maintains that his duty to the bankruptcy court required him to disclose: (1) Hanson's inability to operate due to his alcoholism, (2) Hanson's continuing practice of issuing worthless checks, and (3) Hanson's intent to defraud

Imprint's landlords. Fuller explains that throughout his representation of Hanson, parties to the actions relied on Fuller's integrity, even though they doubted Hanson's. Therefore, Fuller argues that he was required to disclose that he was not representing Hanson and that the parties should not rely on past representations of Fuller about Hanson's stability and commitment to pay his debts.

Fuller relies on Minnesota law and federal bankruptcy law for the proposition that he was required to make disclosures to all others in the bankruptcy action. *See, e.g., Hoppe v. Klapperich*, 224 Minn. 224, 240–241, 28 N.W.2d 780, 791 (1947); *In re Rivers*, 167 B.R. 288, 301 (Bkrtcy. N.D.Ga.1994). In *Hoppe*, we concluded that an attorney is a "quasi judicial" officer and that when a client's interests conflict with the public's interests, the attorney must first fulfill his duties to the public as an officer of the court. *See Hoppe*, 224 Minn. at 240–41, 28 N.W.2d at 791. In *Rivers*, the bankruptcy court explained that when the interests of the debtor in possession conflict with those of the court and the bankruptcy estate, "it is the estate and the court to which the attorney owes his highest allegiance." 167 B.R. at 301. Fuller argues that his duties to the bankruptcy court and the bankruptcy estate overrode any state law duty to maintain Hanson's confidences. Additionally, Fuller argues, our pronouncements in *Hoppe* also dictate that he has a duty to the public to stop the ongoing fraud by his client.

While federal and state law may require-and the Rules of Professional Conduct may authorize-an attorney to disclose the ongoing fraud by a client, it is the scope and methods taken by Fuller that have created the disciplinary problem. Fuller is correct that he could have potential liability for Hanson's wrongdoing if he provided any assistance to Hanson's alleged scheme. *See Hoppe*, 28 N.W.2d at 792. However, Fuller overcompensated and disclosed more information to more

persons than the law requires or the Rules of Professional Conduct authorizes.

The referee found that Fuller made unsubstantiated allegations of death threats, underreporting the sale price of some Imprint assets, gambling, and murder. Fuller testified that he believes all of his statements were truthful and that most were based on statements Hanson made to him, but Fuller is unable to provide substantiating factual support. As a result, the referee found that the disclosures by Fuller were not made for any legitimate purpose. The referee then concluded that Fuller's statements in many of the letters violated Minn. R. Prof. Conduct 3.3(a), 4.1, 4.4, 8.4(c), and 8.4(d).

Even if Fuller could prove the allegations he made in his letters, these disclosures would still need to be justified under Minn. R. Prof. Conduct 1.6(b), which limits the circumstances under which an attorney can reveal client confidences. Although it is plausible for Fuller to argue that he was required to notify the attorney for Imprint's landlords that Hanson intended to defraud them, it is less plausible for Fuller to argue he was required to notify persons, such as the Vice President and the U.S. Attorney General, of Hanson's alleged death threats to Fuller, of Hanson's "serial" bankruptcies, or of Hanson's theft of the Imprint 401(k) monies. We agree with the referee's conclusion that Fuller made improper disclosures; therefore, we conclude the referee's findings and his conclusion that Fuller violated Minn. R. Prof. Conduct 3.3(a), 4.1, 4.4, 8.4(c), and 8.4(d) are not clearly erroneous.

*Failure to Disclose Attorney Fees*

■ The referee found that Fuller failed to disclose his attorney fee arrangement on the Imprint bankruptcy and concluded that this failure violated Fed. R. Bankr.P. 2014. Rule 2014 requires that when a bankruptcy petitioner wishes to employ a professional to assist with the bankruptcy, the petitioner must apply to the court and disclose, among other things, "any proposed arrangement for compensation."

Fed.R.Bankr.P.2014. The referee also concluded that Fuller violated Minn. R. Prof. Conduct 1.5(a), 3.3(a), 3.4(c), and 8.4(c) & (d). To support these conclusions, the referee found that Fuller knowingly failed to disclose the source of his Imprint fees, lied to the bankruptcy court in asserting that he was not requesting fees, and misled the bankruptcy court by failing to disclose that he had a relationship with Hanson because Hanson was paying his attorney fees. Fuller does not deny that he failed to disclose his fee arrangement. However, he justifies his conduct on the ground that the prior course of conduct of Hanson's other attorney, together with the bankruptcy court's and the OLPR's tacit acceptance of that arrangement, satisfied him that it must be acceptable. Regardless of any tacit acceptance of the practice, Fuller's failure to disclose the source of his Imprint attorney fees violated the bankruptcy rules and the Rules of Professional Conduct. We agree with the referee's findings that Fuller failed to disclose or obtain approval for his bankruptcy fees and, therefore, we conclude that the referee's conclusion that Fuller violated Minn. R. Prof. Conduct 3.3(a), 3.4(c), and 8.4(c) & (d) was not clearly erroneous.

■ Minn. R. Prof. Conduct 1.5(a) requires that attorney fees be reasonable and provides a number of factors to be considered, including time and labor required, the customary fee for such service, time limitations, and the expertise required. *See* Minn. R. Prof. Conduct 1.5(a). The referee made no factual findings to support his conclusion that Fuller's fee was unreasonable. The only related finding was that Hanson paid Fuller $290 a week for his services on the Imprint bankruptcy, but there is nothing in the record explaining the work performed in exchange for the fee. Therefore, we find no basis for the referee's conclusion that Fuller's fee violated Minn. R. Prof. Conduct 1.5(a).

*Disciplinary Investigation*

█ The referee concluded that Fuller submitted false or falsified evidence in the course of a disciplinary investigation in violation of Minn. R. Prof. Conduct 3.3(a)(4), 3.4(b), 8.1(a) and 8.4(c). The referee found that Fuller misled the OLPR when he provided it with letters he purportedly wrote and sent before Hanson filed the disciplinary complaint against Fuller. Fuller provided the letter to the OLPR in an effort to prove that his charges against Hanson were not in retaliation for Hanson's complaint to the OLPR. Fuller asserts that he never told the OLPR that he had mailed the letters, but his correspondence to the OLPR suggests the letters were mailed. We conclude that the referee did not clearly err when he found that Fuller misled the OLPR with these letters.

## II.

█ The referee has recommended that Fuller be suspended from the practice of law indefinitely, with a 1–year minimum term of suspension, and that Fuller successfully complete a mental health evaluation and follow all recommendations of the evaluation. Although we afford great weight to the referee's recommendation for attorney discipline, we alone bear the final responsibility to determine what discipline is appropriate. *See In re Klein,* 442 N.W.2d 317, 321 (Minn.1989). In light of the purposes of attorney discipline-to protect the public, to protect the legal profession, and to guard the administration of justice-we determine the appropriate discipline by considering: "(1) the nature of the misconduct, (2) the cumulative weight of the rule violations, (3) the harm to the public, and (4) the harm to the legal profession." *In re Madsen,* 426 N.W.2d 434, 436 (Minn.1988). We also consider mitigating and aggravating circumstances. *See In re Haugen,* 543 N.W.2d 372, 375 (Minn.1996).

The referee found some aggravating factors when reaching his recommended dis-

position. Fuller had been "warned that his letter-writing campaigns could form the basis for serious discipline." Further, Fuller acknowledged at his hearing that persons had asked him if he would like to have Hanson "whacked," to which he responded, "Not yet." However, Fuller did attempt to clarify this statement by explaining that he never would have harmed Hanson.

The referee also found mitigating circumstances. The referee stated that Fuller obviously suffers from a mental illness or disability that impairs his judgment. The referee based this conclusion on the opinion of the psychiatrist who evaluated Fuller and Fuller's conduct during the disciplinary proceedings. The referee noted that Hanson may be a "scalawag," but Fuller appears unable to make rational judgments when they involve Hanson.

█ Our general rule is that mental illness is a mitigating factor that an attorney must raise. *See In re Weyhrich,* 339 N.W.2d 274, 279 (Minn.1983). An attorney who raises a psychological disability must prove five factors: (1) that the attorney has a severe psychological problem; (2) that the psychological problem was the cause of the misconduct; (3) that the attorney is seeking treatment; (4) that the treatment has arrested the misconduct; and (5) that the misconduct is not likely to recur. *See id.* Although Fuller has not acknowledged having a psychological disorder and is not seeking treatment, the OLPR admits in its brief that Fuller meets the first two requirements of the *Weyhrich* test.

█ For guidance in determining the appropriate sanction, we turn to cases involving similar misconduct. *See In re Madsen,* 426 N.W.2d at 436. With the exception of a possible unrecognized psychological issue, we were faced with similar ethics violations in *In re Nelson,* 327 N.W.2d 576, 578–79 (Minn.1983). In *Nelson,* we suspended an attorney for 6 months because he exposed confidential

client information and fabricated information in letters to the probate court, tax authorities, and the Minnesota Securities Division. *See id.* at 580. The referee in *Nelson* found that the violations were intentional and cost the attorney's clients thousands of dollars. *See id.* at 579. While Fuller also acted intentionally, the present case is different because there are no allegations or findings that Fuller's actions caused any financial loss to Imprint or Hanson.

We also have reviewed cases which involve harassment of a client by the client's attorney, but generally in such cases there also have been additional unrelated violations. For example, in *In re Mueller,* 540 N.W.2d 77, 78 (Minn.1995), we imposed a public reprimand and 2 years of probation on an attorney who was making harassing phone calls to a client, which conduct resulted in a misdemeanor conviction. *See id.* Mueller entered into a stipulation with the OLPR that involved ongoing therapy and other conditions. *See id.* We accepted the stipulation and ordered the recommended sanction because Mueller's sanction included the psychological treatment necessary to arrest his inappropriate behavior. *See id.*

In *In re Selmer,* we suspended an attorney, who was already on probation, for 1–year when it was discovered that over a 12–year period he had instituted harassing and frivolous litigation and had made false and misleading statements in response to discovery requests. *See* 568 N.W.2d 702, 704–05 (Minn.1997). *Selmer* is different from Fuller's case because Selmer instituted a number of frivolous suits and frivolous defenses to benefit himself. *See id.* However, the cases are similar in that both involve a variety of Rules of Professional Conduct violations and evaluating the cumulative effect of such violations. *See id.* In concluding that Selmer should be suspended from the practice of law for a minimum 1–year term, we were convinced that his abuse of the litigation process and lack of candor with the tribunal required

such a sanction. *See id.* When we look to *Selmer* for guidance, we conclude that although Fuller has multiple violations, he has not shown the disrespect for the integrity of the judicial system that Selmer did.

Our review of prior discipline cases shows that we have not yet addressed a situation where there is misconduct similar to Fuller's that may be accompanied by an unacknowledged psychological problem. Further, even though Fuller has not acknowledged having a psychological problem, the OLPR has admitted that Fuller's misconduct was caused by an unacknowledged psychological problem. In a situation such as this, we see no reason not to consider a psychological problem in determining the appropriate sanction. Although Fuller did not assert that his psychological condition is a mitigating circumstance, his failure to do so should not bar us from considering the role the condition played in the misconduct because we conclude that if Fuller addresses the symptoms that suggest he may have a psychological problem, he may be able to competently and diligently serve his clients. Therefore, we not only conclude that Fuller has committed misconduct that warrants imposition of a sanction, but we also conclude that Fuller's possible psychological problem needs to be addressed in the sanction.

■ We conclude that the appropriate discipline is indefinite suspension with reinstatement conditioned on providing adequate psychological or other medical evidence establishing that Fuller has no psychological problem that would prevent him from practicing law competently, diligently, and within the rules of conduct for attorneys at law. Fuller may petition for reinstatement at any time upon an adequate showing that the problem that led to his misconduct has been treated such that it no longer interferes with his ability to practice law. Accordingly, we order that:

1. Fuller is hereby suspended from the practice of law indefinitely with no mini-

mum term of suspension, commencing 14 days from the date of this order;

2. Fuller comply with the requirements of Rule 26, RLPR;

3. Before reinstatement, Fuller must provide the director with adequate psychological or other medical evidence establishing that he has no psychological problem that would prevent him from practicing law competently, diligently, and within the rules of conduct for attorneys at law;

4. Fuller must comply with the procedures for reinstatement under Rule 18, RLPR;

5. Fuller shall pay to the Director the sum of $900 in costs and disbursements pursuant to Rule 24, RLPR.

So ordered.

BLATZ, C.J., and GILBERT, J., took no part in the consideration or decision of this case.